## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBERT BROWN, derivatively on behalf of ABBVIE INC., <br><br>     Plaintiff, <br><br>     vs. <br><br> RICHARD A. GONZALEZ, WILLIAM J. CHASE, ROBERT J. ALPERN, ROXANNE S. AUSTIN, WILLIAM H.L. BURNSIDE, EDWARD M. LIDDY, EDWARD J. RAPP, GLENN F. TILTON, FREDERICK H. WADDELL, BRETT J. HART, and MELODY B. MEYER, <br><br>     Defendants, <br><br>     and <br><br> ABBVIE INC., <br><br>     Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY; AND** <br> **(3) UNJUST ENRICHMENT** <br><br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Robert Brown ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant AbbVie Inc. ("AbbVie" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Richard A. Gonzalez, William J. Chase, Robert J. Alpern, Roxanne S. Austin, William H.L. Burnside, Edward M. Liddy, Edward J. Rapp, Glenn F. Tilton, Frederick H. Waddell, Brett J. Hart, and Melody B. Meyer (collectively, the "Individual Defendants" and together with AbbVie, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of AbbVie, unjust enrichment, and violations of

1

Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AbbVie, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by AbbVie's directors and officers from October 25, 2013 through the present (the "Relevant Period").

2. AbbVie is a biopharmaceutical company whose principal business is the discovery, development, manufacture and sale of a broad line of pharmaceutical products, which are generally sold worldwide directly to wholesalers, distributors, government agencies, health care facilities, specialty pharmacies, and independent retailers from AbbVie-owned distribution centers and public warehouses.

3. AbbVie's largest product is HUMIRA (adalimumab), a biologic therapy administered as a subcutaneous injection, and is approved to treat several autoimmune diseases in the U.S. Canada, Mexico, and in the European Union.  HUMIRA had worldwide net revenues of approximately $18.4 billion in 2017, and is one of the world's greatest selling medications.

4.     HUMIRA is an extremely strong and dangerous drug.  It's label contains a boxed warning that warns of serious infections and malignancy, noting that patients treated with HUMIRA are at increased risk for developing serious infections that may lead to hospitalization or death, and that lymphoma and other malignancies, some fatal, have been reported in children and adolescent patients treated with tumor necrosis factor blockers including HUMIRA.

5.     On May 1, 2018, the Company announced that it commenced a modified "Dutch auction" tender offer (the "Tender Offer") to purchase up to $7.5 billion of the Company's common stock at a price between $99.00 and $114.00 per share.  Per the terms of the Tender Offer, "AbbVie stockholders may tender all or a portion of their shares at a price specified by the tendering stockholder within this range.  When the tender offer expires, AbbVie will determine the lowest price within the range of prices specified above that allows AbbVie to purchase up to an aggregate of $7.5 billion of its common stock."

6.     The Tender Offer expired on May 29, 2018, and on May 30, 2018, the Company issued a press release announcing the preliminary results of the of the Tender Offer.  The press release noted that 75.7 million total shares of Company stock were tendered at or below the purchase price of $105.00 per share.  As a result, AbbVie would acquire 71.4 million shares of Company stock at the $105.00 per share purchase price, for an aggregate cost of $7.5 billion gross of fees and expenses.

7.     Later on May 30, 2018, after the close of regular trading, the Company issued an additional press release announcing updated preliminary results of the Tender Offer.  The press release revealed that a total 74.0 million shares of Company stock had been tendered and not properly withdrawn at or below the purchase price of $103.00 per share, including 52.9 million shares that were tendered by notice of guaranteed delivery.  The Company, as a result, noted that

the Company would now acquire 72.8 million shares of AbbVie common stock at a price of $103.00 per share. The press release moreover stated that "this updated reflects additional shares that were validly tendered by notice of guaranteed delivery, but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare trust Company, N.A., the depositary for the tender offer."

8. In between the Company's May 30, 2018 announcements, the price per share of Company stock traded between $100.83 and $103.16 per share, closing at $103.01. This represented an almost 4% increase over the previous day's closing price. In total, over 31 million shares of Company stock were traded that day, which represented over $3.1 billion and represented the greatest volume traded in Company stock on a single day in over three years.

9. On September 18, 2018, the State of California filed an action in the Superior Court of the State of California, County of Alameda (the "Illegal Kickback Action") against AbbVie and culpable parties yet to be identified, alleging systematic and repeated violations of the Insurance Fraud Prevention Act by providing kickbacks to healthcare providers throughout California to get these providers to prescribe HUMIRA in much greater amounts than these healthcare providers would have prescribed it but for the illegal kickbacks (the "Kickback Misconduct").

10. On September 18, 2018, *Bloomberg* published an article reporting on the Illegal Kickback Action, stated, "California Sues AbbVie Over Alleged Arthritis Drug Kickbacks." The article quoted various parts of the complaint filed in the Illegal Kickback Action, and provided a brief summary of the allegations made therein.

11. On this news, the price per share of AbbVie common stock fell $2.76 per share, or 2.8%, from the previous day's trading price, closing at $92.61 per share on September 18, 2018.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in the Kickback Misconduct.

13.     The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

14.     During the Relevant Period, the Individual Defendants, also in breach of their fiduciary duties owed to the Company, willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose the true amount of shares and the price for those shares that the Company would purchase through the Tender Offer.

15.     Also during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to AbbVie, willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.  As a result of the foregoing, AbbVie's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), and its former Chief Financial

Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois, the Company and its former CFO to another securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (together, the "Securities Class Actions"), the Company to the Illegal Kickback Action, the need to undertake internal investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and is costing the Company millions of dollars.

18. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in one of the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the AbbVie Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

21. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Illinois or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of AbbVie. Plaintiff has continuously held AbbVie common stock at all relevant times.

### Nominal Defendant AbbVie

27.     Nominal Defendant AbbVie is a Delaware corporation headquartered at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie stock trades on the NYSE under the ticker symbol "ABBV."

### Defendant Gonzalez

28.     Defendant Richard A. Gonzalez ("Gonzalez") has served as the Company's CEO and Chairman of the Board since December 2012.  According to the Company's Schedule 14A filed with the SEC on March 19, 2018 (the "2018 Proxy Statement"), as of January 31, 2018,

Defendant Gonzalez beneficially owned 279,337 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Gonzalez owned over $31.3 million worth of AbbVie stock.

29. For the fiscal year ended December 31, 2017, Defendant Gonzalez received $22,625,243 in compensation from the Company. This included $1,638,462 in salary, $9,606,360 in stock awards, $2,559,270 in option awards, $4,331,250 in non-equity incentive plan compensation, $3,496,704 in change in pension value and non-qualified deferred compensation earnings, and $993,197 in all other compensation.

30. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gonzalez made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 28, 2018 | 8,280 | $ 117.89 | $ 976,129.20 |
| November 21, 2017 | 218,193 | $ 94.01 | $ 218,287.01 |
| August 7, 2017 | 193,131 | $ 71.03 | $ 13,718,094.00 |
| August 4, 2017 | 22,038 | $ 71.08 | $ 1,566,461.00 |
| August 3, 2017 | 65,861 | $ 71.00 | $ 4,676,131.00 |
| May 19, 2017 | 71,235 | $ 65.48 | $ 4,664,467.80 |
| March 8, 2017 | 72,016 | $ 64.25 | $ 4,627,028.00 |
| June 2, 2016 | 285,953 | $ 63.87 | $ 18,263,818.00 |
| May 11, 2016 | 39,000 | $ 63.80 | $ 2,488,200.00 |
| July 29, 2015 | 40,021 | $ 71.25 | $ 2,851,496.20 |
| July 29, 2015 | 24,979 | $ 71.09 | $ 1,775,757.10 |
| April 8, 2015 | 1,300 | $ 64.87 | $ 84,331.00 |
| April 28, 2015 | 62,932 | $ 64.83 | $ 4,079,881.50 |
| April 28, 2015 | 8,281 | $ 64.93 | $ 537,685.33 |
| March 4, 2014 | 4,799 | $ 51.20 | $ 245,708.80 |

31. Thus, in total, before the fraud was exposed, he sold 1,118,019 Company shares on inside information, for which he received over $60.7 million. His insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32. The Company's 2018 Proxy Statement stated the following about Defendant Gonzalez:

> *Chairman of the Board and Chief Executive Officer, AbbVie Inc.*[1]
> Mr. Gonzalez is the chairman and chief executive officer of AbbVie. He served as Abbott's executive vice president of the pharmaceutical products group from July 2010 to December 2012, and was responsible for Abbott's worldwide pharmaceutical business, including commercial operations, research and development, and manufacturing. He also served as president, Abbott Ventures Inc., Abbott's medical technology investment arm, from 2009 to 2011. Mr. Gonzalez joined Abbott in 1977 and held various management positions before briefly retiring in 2007, including: Abbott's president and chief operating officer; president, chief operating officer of Abbott's Medical Products Group; senior vice president and president of Abbott's former Hospital Products Division; vice president and president of Abbott's Health Systems Division; and divisional vice president and general manager for Abbott's Diagnostics Operations in the United States and Canada.

> **Key Contributions to the Board:** As a result of his service as Abbott's executive vice president, Pharmaceutical Products Group, his previous service as Abbott's president and chief operating officer and his more than 30-year career at Abbott, Mr. Gonzalez has developed valuable business, management and leadership experience, as well as extensive knowledge of AbbVie and its global operations. Mr. Gonzalez's experience and knowledge enable him to contribute to AbbVie's board key insights into strategic, management, and operational matters.

### Defendant Chase

33. Defendant William J. Chase ("Chase") has served as the Company's Executive Vice President, Finance and Administration since October 19, 2018, and previously served as the Company's Executive Vice President, Chief Financial Officer from December 2012 until October 19, 2018. According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Chase beneficially owned 184,044 shares of the Company's common stock. Given that the price

---

[1] Emphasis in original throughout.

per share of the Company's common stock at the close of trading on May 31, 2018 was $112.22, Chase owned over $20.6 million worth of AbbVie stock.

34.     For the fiscal year ended December 31, 2017, Defendant Chase received $12,044,593 in compensation from the Company. This included $1,008,526 in salary, $3,681,906 in stock awards, $980,980 in option awards, $1,954,549 in non-equity incentive plan compensation, $4,223,300 in change in pension value and non-qualified deferred compensation earnings, and $195,332 in all other compensation.

35.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chase made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| February 28, 2018 | 38,528 | $ 119.44 | $ 4,601,784.30 |
| March 1, 2018 | 32,400 | $ 114.5 | $ 3,709,800.00 |
| May 18, 2017 | 38,300 | $ 65.35 | $ 2,502,905.00 |
| December 2, 2016 | 6,600 | $ 59.19 | $ 390,654.00 |
| December 22, 2014 | 8,495 | $ 68.00 | $ 577,660.00 |
| March 3, 2014 | 3,948 | $ 50.53 | $ 199,492.44 |

36.     Thus, in total, before the fraud was exposed, he sold 128,271 Company shares on inside information, for which he received over $11.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's Form 10-K filed with the SEC on February 16, 2018 stated the following about Defendant Chase:

> Mr. Chase is AbbVie's Executive Vice President, Chief Financial Officer. He served as Abbott's Vice President, Licensing and Acquisitions from 2010 to 2012, as Vice President, Treasurer from 2007 to 2010, and as Divisional Vice President, Controller of Abbott International from 2004 to 2007. Mr. Chase joined Abbott in 1989.

**Defendant Alpern**

38.     Defendant Robert J. Alpern ("Alpern") has served as a Company director since 2013.  He also serves as a member of the Nominations and Governance Committee and the Public Policy Committee.  According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Alpern beneficially owned 21,789 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Alpern owned over $2.4 million worth of AbbVie stock.

39.     For the fiscal year ended December 31, 2017, Defendant Alpern received $335,929 in compensation from the Company. This included $105,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, $20,948 in change in pension value and nonqualified deferred compensation earnings, and $25,000 in all other compensation.

40.     The Company's 2018 Proxy Statement stated the following about Defendant Alpern:

> *Ensign Professor of Medicine, Professor of Internal Medicine, and Dean of Yale School of Medicine*
> Dr. Alpern has served as the Ensign Professor of Medicine, Professor of Internal Medicine, and Dean of Yale School of Medicine since June 2004. From July 1998 to June 2004, Dr. Alpern was the Dean of The University of Texas Southwestern Medical Center. Dr. Alpern also serves as a director of Abbott Laboratories and as a director on the Board of Yale-New Haven Hospital.
>
> **Key Contributions to the Board:** As the Ensign Professor of Medicine, Professor of Internal Medicine, and Dean of Yale School of Medicine, Dean of The University of Texas Southwestern Medical Center, and as a director on the Board of Yale-New Haven Hospital, Dr. Alpern contributes valuable insights to the board through his medical and scientific expertise and his knowledge of the health care environment and the scientific nature of AbbVie's key research and development initiatives.

**Defendant Austin**

41.     Defendant Roxanne S. Austin ("Austin") has served as a Company director since 2013.  She also serves as Chairperson of the Audit Committee and a member of the Compensation Committee.   According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Austin beneficially owned 36,296 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Austin owned over $4 million worth of AbbVie stock.

42.     For the fiscal year ended December 31, 2017, Defendant Austin received $320,300 in compensation from the Company. This included $130,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $5,319 in all other compensation.

43.     The Company's 2018 Proxy Statement stated the following about Defendant Austin:

> *President, Austin Investment Advisors*
> Ms. Austin is president of Austin Investment Advisors, a private investment and consulting firm, and chairs the U.S. Mid-market Investment Advisory Committee of EQT Partners. Previously, Ms. Austin also served as the president and chief executive officer of Move Networks, Inc., a provider of Internet television services. Ms. Austin served as president and chief operating officer of DIRECTV, Inc. Ms. Austin also served as executive vice president and chief financial officer of Hughes Electronics Corporation and as a partner of Deloitte & Touche LLP. Ms. Austin is also a director of Abbott Laboratories, Target Corporation, and Teledyne Technologies, Inc. Ms. Austin also served as a director of Telefonaktiebolaget LM Ericsson from 2008 to 2016.
>
> **Key Contributions to the Board:** Through her extensive management and operating roles, including her financial roles, Ms. Austin contributes significant oversight and leadership experience to the board, including financial expertise and knowledge of financial statements, corporate finance and accounting matters.

**Defendant Burnside**

44.     Defendant William H.L. Burnside ("Burnside") has served as a Company director since 2013.  He also serves as a member of the Audit Committee and Nominations and Governance

Committee. According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Burnside beneficially owned 13,230 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Burnside owned over $1.4 million worth of AbbVie stock.

45. For the fiscal year ended December 31, 2017, Defendant Burnisde received $320,981 in compensation from the Company. This included $111,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

46. The Company's 2018 Proxy Statement stated the following about Defendant Burnside:

> *Retired Senior Vice President and Director at The Boston Consulting Group*
> Mr. Burnside is a retired senior vice president and director at The Boston Consulting Group (BCG), where he currently serves as an advisor. Prior to becoming managing partner of BCG's Los Angeles office in 1987, he worked in BCG's London and Chicago offices, servicing clients in telecommunications, media, defense, financial services, and manufacturing. Mr. Burnside is a director at Audubon California.

> **Key Contributions to the Board:** Through his experience with The Boston Consulting Group, Mr. Burnside contributes knowledge and understanding of corporate finance and capital markets matters to the board, as well as global and domestic strategic advisory experience across a broad base of industries.

## Defendant Liddy

47. Defendant Edward M. Liddy ("Liddy") has served as a Company director since 2013. He also serves as Chairperson of the Compensation Committee and as a member of the Public Policy Committee. According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Liddy beneficially owned 18,351 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Liddy owned over $2 million worth of AbbVie stock.

48. For the fiscal year ended December 31, 2017, Defendant Liddy received $309,981 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $184,981 in restricted stock unit awards.

49. The Company's 2018 Proxy Statement stated the following about Defendant Liddy:

*Retired Chairman & CEO, The Allstate Corporation*
Mr. Liddy served as a partner in the private equity investment firm Clayton, Dubilier & Rice, LLC from January 2010 to December 2015. At the request of the Secretary of the U.S. Department of the Treasury, Mr. Liddy served as interim chairman and chief executive officer of American International Group, Inc. (AIG), a global insurance and financial services holding company, from September 2008 to August 2009. From January 1999 to April 2008, Mr. Liddy served as chairman of the board of The Allstate Corporation (insurance). He served as chief executive officer of Allstate from January 1999 to December 2006, president from January 1995 to May 2005, and chief operating officer from August 1994 to January 1999. Mr. Liddy currently serves on the board of directors of Abbott Laboratories, 3M Company, and The Boeing Company.

**Key Contributions to the Board:** Mr. Liddy's executive leadership at Allstate and AIG and his board service at several Fortune 100 companies enable him to provide our board with valuable insights on corporate strategy, risk management, corporate governance and other issues facing large, global enterprises. Additionally, as a former chief financial officer, audit committee chair at Goldman Sachs and 3M, and a private equity firm partner, Mr. Liddy provides our board with significant knowledge and understanding of corporate finance, capital markets, financial reporting and accounting matters.

**<u>Defendant Rapp</u>**

50. Defendant Edward J. Rapp ("Rapp") has served as a Company director since 2013. He also serves as Chairperson of the Public Policy Committee and as a member of the Audit Committee. According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Rapp beneficially owned 15,498 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Rapp owned over $1.7 million worth of AbbVie stock.

51.     For the fiscal year ended December 31, 2017, Defendant Rapp received $342,025 in compensation from the Company. This included $131,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $26,044 in all other compensation.

52.     The Company's 2018 Proxy Statement stated the following about Defendant Rapp:

*Retired Group President for Resource Industries of Caterpillar Inc.*
Mr. Rapp served as the Caterpillar Inc. group president for resource industries from 2014 until his retirement in mid-2016. He previously served at Caterpillar as group president based in Singapore in 2013 and 2014 and as the chief financial officer from 2010 to 2013, and he was named a group president in 2007. Mr. Rapp is presently a board member for FM Global. He is currently a member of the University of Missouri College of Business Strategic Development Board.

**Key Contributions to the Board:** As a result of his tenure as group president and chief financial officer at Caterpillar Inc., Mr. Rapp has acquired management, operational, and financial expertise with extensive global experience and provides the board with an informed perspective on financial and operational matters faced by a complex international company.

### Defendant Tilton

53.     Defendant Glenn F. Tilton ("Tilton") has served as a Company director since 2013. He also serves as Lead Director, Chairperson of the Nominations and Governance Committee, and as a member of the Compensation Committee.  According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Tilton beneficially owned 32,786 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Tilton owned over $3.6 million worth of AbbVie stock.

54.     For the fiscal year ended December 31, 2017, Defendant Tilton received $359,981 in compensation from the Company. This included $150,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

55.     The Company's 2018 Proxy Statement stated the following about Defendant Tilton:

*Retired Chairman and Chief Executive Officer of the UAL Corporation*

Mr. Tilton was chairman of the Midwest for JPMorgan Chase & Co. from 2011 until his retirement in 2014. From October 2010 to December 2012, Mr. Tilton also served as the non-executive chairman of the board of United Continental Holdings, Inc. From September 2002 to October 2010, he served as chairman, president and chief executive officer of UAL Corporation, and chairman and chief executive officer of United Air Lines, Inc., its wholly owned subsidiary. Prior to becoming the vice chairman of Chevron Texaco following the merger of Texaco Inc. and Chevron Corp., Mr. Tilton enjoyed a 30-year multi-disciplinary career with Texaco Inc., culminating in his election as chairman and chief executive officer. Mr. Tilton is also a director of Abbott Laboratories and Phillips 66. Mr. Tilton also served on the board of directors of Lincoln National Corporation from 2002 to 2007, of TXU Corporation from 2005 to 2007, of Corning Incorporated from 2010 to 2012, and of United Continental Holdings, Inc. from 2010 to 2012.

**Key Contributions to the Board:** As chairman of the Midwest for JPMorgan Chase & Co. and having previously served as non-executive chairman of the board of United Continental Holdings, Inc., and chairman, president, and chief executive officer of UAL Corporation and United Air Lines, vice chairman of Chevron Texaco and as interim chairman of Dynegy, Inc., Mr. Tilton acquired strong management experience overseeing complex multinational businesses operating in highly regulated industries, as well as expertise in finance and capital markets matters. His experience as non-executive chairman of the board of United Continental Holdings, Inc. also enhances his contributions as AbbVie's lead independent director.

### Defendant Waddell

56.     Defendant Frederick H. Waddell ("Waddell") has served as a Company director since 2013.  He also serves as a member of the Audit Committee and the Compensation Committee.  According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Waddell beneficially owned 15,230 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Waddell owned over $1.7 million worth of AbbVie stock.

57.     For the fiscal year ended December 31, 2017, Defendant Waddell received $320,981 in compensation from the Company. This included $111,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

58.     The Company's 2018 Proxy Statement stated the following about Defendant Waddell:

> *Chairman of the Board and Former Chief Executive Officer of Northern Trust Corporation and The Northern Trust Company*
> Mr. Waddell has served as chairman of the board of Northern Trust Corporation and The Northern Trust Company since November 2009. He previously served as chief executive officer from 2008 through 2017, as president from 2006 to 2011 and again from October to December 2016, and chief operating officer from 2006 to 2008. Mr. Waddell is also a director of International Business Machines Corporation.
>
> **Key Contributions to the Board:** As chairman and former chief executive officer of Northern Trust Corporation and The Northern Trust Company, Mr. Waddell contributes broad financial services experience with a strong record of leadership in a highly regulated industry.

### Defendant Hart

59.     Defendant Brett J. Hart ("Hart") has served as a Company director since 2016. He also serves as a member of the Nominations and Governance Committee. According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Hart beneficially owned 5,744 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Hart owned over $644,591 worth of AbbVie stock.

60.     For the fiscal year ended December 31, 2017, Defendant Hart received $314,981 in compensation from the Company. This included $105,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

61.     The Company's 2018 Proxy Statement stated the following about Defendant Hart:

> *Executive Vice President, Chief Administrative Officer and General Counsel, United Continental Holdings, Inc.*
> Mr. Hart is the executive vice president, chief administrative officer and general counsel of United Continental Holdings, Inc. (UAL) and United Airlines, Inc., a position he has held since May 2017. He served as executive vice president and general counsel between February 2012 and May 2017. Mr. Hart also served as

acting chief executive officer of UAL and United Airlines, Inc. from October 2015 to March 2016. From December 2010 to February 2012, he served as senior vice president, general counsel and secretary of UAL, United and Continental. From June 2009 to December 2010, Mr. Hart served as executive vice president, general counsel and corporate secretary at Sara Lee Corporation.

**Key Contributions to the Board:** As an executive vice president and general counsel for two large public companies with international operations and having served as an acting CEO, Mr. Hart contributes operational and strategic acumen with expertise in risk management, legal strategic matters, government and regulatory affairs, customer and external facing matters, corporate governance, and compliance.

### Defendant Meyer

62.     Defendant Melody B. Meyer ("Meyer") has served as a Company director since May 2017.  She also serves as a member of the Audit Committee and the Public Policy Committee. According to the Company's 2018 Proxy Statement, as of January 31, 2018, Defendant Meyer beneficially owned 2,770 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $112.22, Meyer owned over $310,849 worth of AbbVie stock.

63.     For the fiscal year ended December 31, 2017, Defendant Meyer received $274,731 in compensation from the Company. This included $64,750 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

64.     The Company's 2018 Proxy Statement stated the following about Defendant Meyer:

*President of Melody Meyer Energy, LLC*
Ms. Meyer is president of Melody Meyer Energy, LLC, a private consulting firm, a position she has held since June 2016. From March 2011 to April 2016, Ms. Meyer served as the president of Chevron Asia Pacific Exploration and Production Company. She previously served as president of Chevron Energy Technology Company from 2008 to 2011, in addition to various other roles over her thirty-seven year career at Chevron. Ms. Meyer is also a director at BP p.I.c and National Oilwell Varco, Inc.

**Key Contributions to the Board:** As a result of her tenure at Chevron, Ms. Meyer has acquired operational, management, strategic planning, and financial expertise with extensive global experience and provides an informed perspective to the board on financial and operational matters faced by a complex international company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.     By reason of their positions as officers and/or directors of AbbVie and because of their ability to control the business and corporate affairs of AbbVie, the Individual Defendants owed AbbVie and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AbbVie in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AbbVie and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to AbbVie and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AbbVie, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the officers and directors of AbbVie were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of AbbVie, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised AbbVie's Board at all relevant times.

70.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.    To discharge their duties, the officers and directors of AbbVie were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AbbVie were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States,

and pursuant to AbbVie's own Code of Business Conduct;

      (b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (c)     remain informed as to how AbbVie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      (d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AbbVie and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AbbVie's operations would comply with all applicable laws and AbbVie's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to AbbVie and the shareholders the duty of loyalty requiring that each favor AbbVie's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AbbVie and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, and directorial positions with AbbVie, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AbbVie.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

78. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AbbVie was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AbbVie, and was at all times acting within the course and scope of such agency.

## ABBVIE'S CODE OF CONDUCT AND GOVERNANCE GUIDELINES

81. The Company's Code of Business Conduct (the "Code of Conduct"), provides that it "applies globally to all AbbVie employees."

82. The Code of Conduct provides, as to reporting violations of the Code of Conduct or illegal activity, that:

**WE SPEAK UP**

OUR CULTURE ENCOURAGES OPEN COMMUNICATION AND RESPECTFUL DISCUSSION.  It is everyone's responsibility to speak up!  This is how we resolve problems and enhance our performance.

\* \* \*

If you…**see** inappropriate behavior, a Code violation or illegal activity SPEAK UP!

If you…**suspect** inappropriate behavior, a Code violation or illegal activity SPEAK UP!

Don't wait for someone else to speak up. Sometimes, a simple, "please don't do that" to a coworker may be enough to correct behavior. If it doesn't work, raise the concern yourself. Looking the other way when it comes to unlawful or unethical conduct puts us all at risk.

83.     The Code of Conduct states that the Company and its employees "follow industry laws and regulations," stating, in relevant part:

**WE FOLLOW INDUSTRY LAWS AND REGULATIONS**

WE VALUE THE LONG-STANDING TRUST WE HAVE EARNED WORLDWIDE. Patients, healthcare providers, customers and suppliers know they can rely on us because we comply with the laws, regulations and codes that govern the pharmaceutical industry and our company (e.g., European Federation of Pharmaceutical Industries and Associations [EFPIA] and International Federation of Pharmaceutical Manufacturers and Associations [IFPMA]).

\* \* \*

Respect for each other, our business performance and our culture includes knowing and honoring the rules and regulations that govern our industry. These include laws and regulations regarding: . . . Promoting and selling our products[;] Marketing our products[;] [and] Distributing our products[.]

84.     As to the Company promotion practices, the Code of Conduct states, in relevant part:

**WE PROMOTE PRODUCTS RESPONSIBLY**

OUR ADVERTISING AND PROMOTION EFFORTS FOCUS ON ECONVEYING USEFUL PRODUCT INFORMATION TO HEALTHCARE PROVIDERS, PATIENTS AND CUSTOMERS.  We only promote our pharmaceutical products for uses that have been approved or authorized by

appropriate government or regulatory agencies, (e.g., we don't promote in the United States a use that has been approved by the French but not the U.S. government). Our product claims are grounded in scientific evidence, accepted medical practice and government approved labeling rules in all countries where we operate.

85.     As to the Company compliance with all applicable laws that regulate its business,

the Code of Conduct provides, in relevant part:

**WE MAINTAIN TRUSTWORTHY BUSINESS PRACTICES**

WE COMPLY WITH ALL APPLICABLE LAWS THAT REGULATE OUR BUSINESS. Many of these laws concern the way we promote and sell our medical products. It is never acceptable to try to influence purchasing decisions in any way that is unethical, inappropriate or illegal or creates a potential conflict of interest. We are honest, open and up-front when we interact with those who may be interested in buying or prescribing our products.

* * *

Compliance with the law inspires trust in our culture of integrity. We abide by all laws, regulations, policies and procedures that apply to our jobs including…

- **U.S. Anti-Kickback Statute.** We don't give anything of value to induce a healthcare professional to use or recommend pharmaceutical products that are paid for or reimbursed by the government.

- **U.S. False Claims Act and similar laws in other countries.** We don't submit or cause the submission of false claims for healthcare reimbursement to the government.

- **Food, Drug and Cosmetic Act and similar laws in other countries.** We don't promote a regulated product or an indication that has not received FDA or other appropriate regulatory approval.

- **Transparency Laws.** We report certain payments to physicians and other customers, as required by transparency laws and regulations in every location where we operate.

- **U.S. Foreign Corrupt Practices Act, the United Kingdom Bribery Act and similar laws in other countries.** We do not participate in bribery or corruption and adhere to all local laws and regulations that cover bribery and corruption.

86.     The Code of Conduct provides that the Company "compl[ies] with anti-bribery and

anti-corruption laws," stating, in relevant part:

**WE COMPLY WITH ANTI-BRIBERY AND ANTI-CORRUPTION LAWS**

WE DO NOT TOLERATE IMPROPER PAYMENTS.  WE UNDERSTAND
THAT ACCEPTING, OFFERING OR GIVING ANYTHING OF VALUE TO
INFLUENCE A BUSINESS DECISION OR GAIN AN UNFAIR BUSINESS
ADVANTAGE IS IMPROPER.  We also understand that improper payments
received or given can have severe repercussions for the individuals involved, for
AbbVie and ultimately, for our industry and the people we serve. We are careful to
maintain accurate books and records to reflect all payments made and received, and
we avoid even the appearance of anything improper.

We recognize that we may be responsible for improper payments made by third
parties conducting business on our behalf, so we have due diligence processes in
place to ensure we know who we are working with, that they have a reputation for
operating honestly and with integrity and that any payments made on our behalf are
appropriate.

87.     The Code of Conduct provides that the Company "manage[s] and store[s] records

accurately," stating, in relevant part:

WE ENSURE THE INTEGRITY OF OUR BUSINESS TRANSACTIONS BY
KEEPING DOCUMENTS AND RECORDS ORGANIZED AND MAKING
SURE ENTRIES ARE ACCURATE, COMPLETE AND THOROUGH.  We store
records securely and maintain them in accordance with our Records Management
Program.

88.     The Code of Conduct provides that the Company "communicate[s] with the public

appropriately," stating in relevant part:

IT IS A PRIVILEGE TO SHARE THE PRIDE OF OUR ACCOMPLISHMENTS
WITH THE WORLD. WHEN WE SHARE INFORMATION, THE PUBLIC
EXPECTS US TO BE CONSISTENT AND ACCURATE.

89.     The Code of Conduct provides that the Company "compl[ies] with insider trading

laws," stating, in relevant part:

IN THE COURSE OF OUR JOBS, WE MAY HEAR OR KNOW ABOUT A
COMPANY'S BUSINESS ACTIVITIES OR PLANS THAT ARE NOT YET
PUBLICIZED. Information that has not been made public, but if known, may

persuade a reasonable investor to buy, sell or hold a company's securities is called "inside" or "nonpublic" information. Never use this information – whether it is about AbbVie or any other company -- to conduct a trade. Never "tip" someone else on what you know so that they may trade. Insider trading and tipping are illegal.

90.     AbbVie's Governance Guidelines (the "Governance Guidelines") provide that, "Directors shall adhere to the principles of AbbVie's Code of Business Conduct as it applies to directors."

91.     The Governance Guidelines lists the obligations of directors, which include:

**Compliance with Laws.**

Directors shall comply with all laws, rules and regulations applicable to their capacity as directors of AbbVie, including, among others, the insider trading laws, rules and regulations.

**Protection of AbbVie's Assets.**

Directors shall protect AbbVie's assets and promote their efficient and legitimate business use.

* * *

**Reporting of any Illegal or Unethical Behavior.**

Directors shall report violations of laws, rules, regulations or the Code of Business Conduct to the Chairman of the Board and Chief Executive Officer, the Vice President and Chief Ethics and Compliance Officer, or any other appropriate AbbVie personnel.

92.     In violation of the Code of Conduct and Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Also in violation of the Code of Conduct and Governance Guidelines, the Individual Defendants failed to maintain the

accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.     AbbVie is a biopharmaceutical company whose principal business is the discovery, development, manufacture and sale of a broad line of pharmaceutical products, which are generally sold worldwide directly to wholesalers, distributors, government agencies, health care facilities, specialty pharmacies, and independent retailers from AbbVie-owned distribution centers and public warehouses.

94.     AbbVie was incorporated in April 10, 2012, and on January 1, 2013, AbbVie became an independent company as a result of the distribution by Abbott Laboratories of 100% of the outstanding common stock of AbbVie to Abbott Laboratories' shareholders.

95.     AbbVie's largest product is HUMIRA (adalimumab), a biologic therapy administered as a subcutaneous injection, and is approved to treat several autoimmune diseases in the U.S. Canada, Mexico, and in the European Union.  HUMIRA had worldwide net revenues of approximately $18.4 billion in 2017, and is one of the world's greatest selling medications.

96.     HUMIRA is an extremely strong and dangerous drug.  It's label contains a boxed warning that warns of serious infections and malignancy, noting that patients treated with HUMIRA are at increased risk for developing serious infections that may lead to hospitalization or death, and that lymphoma and other malignancies, some fatal, have been reported in children and adolescent patients treated with tumor necrosis factor blockers including HUMIRA.

**The Kickback Misconduct**

97.     During the Relevant Period, the Individual Defendants caused the Company to reward healthcare providers with kickbacks in order to induce them to write more prescriptions and refills for HUMIRA.

98.     Many of the prescribers of HUMIRA work in gastroenterology, rheumatology, and dermatology practices that often employ nurses and staff to provide patients with insurance-related advice and counseling, which requires considerable resources and takes up a lot of time.  Services offered by these nurses and staff include instruction on how to administer drugs, assistance with insurance forms and insurance coverage, assistance with pharmacy-related matters, answering any questions that patients may have, and following up with patients to monitor their adherence to prescribed medication schedules.  These nurses and staff members are provided with substantial benefits and salaries, but are often overworked.

99.     The Company offers additional staff to healthcare providers at no cost when they decide to prescribe HUMIRA (the "Ambassador Program"), eliminating some of these providers' resource and staffing needs.  The Company specifically refers to such additional staff by a variety of titles including, "Nurse Ambassador," "Patient Ambassador," "Nurse Educator," "Clinical Nurse Educator," and "HUMIRA Ambassador" (referred to herein as, the "Ambassador(s)").

100.     Healthcare providers, as a result, in determining which medications to prescribe, would be left with the choice of deciding between HUMIRA, which would mean free Ambassadors, or an alternative medication which would mean the provider would have to provide, and incur the costs for, its own nurses and staff.  In making prescribing decisions under these circumstances, healthcare providers cannot help but consider the substantial kickback that the

Ambassador Program provides, leading to not only additional HUMIRA prescriptions, but also insurers paying more HUMIRA-related claims.

101. The Ambassador Program is comprised of a nation-wide network of nurses providing services for HUMIRA patients which healthcare providers would normally provide. The Ambassador Program is implemented through IQVIA (f/k/a Quintiles IMS), who the Company contracted with to provide registered nurses employed through IQVIA to serve as AbbVie representatives and deal directly with patients, doctors, and office staff.

102. The Ambassadors would visit healthcare providers with the intention of increasing enrollment in the Ambassador Program. Often, the support provided through the Ambassador Program was given pursuant to a signed medical order.

103. The Ambassadors would accompany AbbVie sales representatives on visits to the offices of healthcare providers and, upon enrolment in the Ambassador Program, the Ambassadors would serve as extensions of healthcare providers' offices. Patients that enrolled in the Ambassador Programs would gain access to registered nurses that administer HUMIRA injections in patients' homes and train patients on injections.

104. The Ambassador Program was of great benefit to physicians, but what was previously patient-physician conversations would be replaced by conversations between Ambassadors and patients, leading to serious concerns. For instance, Ambassadors were given direct access to patients—even in their homes—who were vulnerable and could take advantage of them to make sure they used HUMIRA and their prescriptions would be filled. The Ambassadors would downplay the risks of taking HUMIRA, and would not be able to answer certain important questions that patients asked.

105.    The Individual Defendants caused the Company to implement the Ambassador Program for the purpose of increasing HUMIRA prescriptions.  The Individual Defendants also caused the Company to provide additional kickbacks to induce prescriptions of HUMIRA.

106.    In addition to the Ambassador Program, the Company also gave prescribers cash payments and gifts, paid for expensive meals and alcohol, and paid for trips as kickbacks.  AbbVie also gave providers cost-free kickbacks in the form of technology, including expensive and sophisticated proprietary software and hardware for the purpose of inducing HUMIRA prescriptions.  The Company also gave kickbacks in the form of services, including fulfillment and marketing services.  Specifically, the Company used its own pharmacy to assist healthcare providers with prior authorization, specialty pharmacy, and other fulfillment and insurance-related issues.  The Company's pharmacy would give administrative support to providers' offices and would serve as extensions of their offices.  AbbVie additionally helped healthcare providers market their practices to ultimately lead to increased prescriptions for HUMIRA.

107.    Each of the kickbacks that comprised the Kickback Misconduct induced healthcare providers to write HUMIRA prescriptions, leading to increased private insurance claims for HUMIRA.  The Kickback Misconduct caused by the Individual Defendants thus had its intended effect.

108.    Interviews of confidential witnesses in the Illegal Kickback Action provide support for the claims alleged herein.

109.    The Illegal Kickback Action specifically requests as relief that the Company, *inter alia*, be assessed three times the amount of each claim for compensation pursuant to contracts of insurance made for HUMIRA and civil penalties of $10,000 for each fraudulent claim presented to an insurance company.

110.    Per data obtained by the State of California in the Illegal Kickback Action, private insurers paid in excess of $1.29 billion from 2013 to August 2018 to cover HUMIRA prescriptions for California insured patients, paying out over 274,000 claims.  Thus, due to the Individual Defendants' breaches of fiduciary duty, AbbVie may be on the hook for a gargantuan sum of money.

**False and Misleading Statements Related to the Kickback Misconduct**

***October 25, 2013 Press Release***

111.    On October 25, 2013, the Company issued a press release announcing its financial results for its third fiscal quarter ended September 30, 2013.  In the press release, Defendant Gonzalez touted the Company's performance, stating, in relevant part:

> "Our third-quarter performance demonstrates the strength and durability of our product portfolio and the continued execution of our key strategic priorities as an independent biopharmaceutical company," said Richard A. Gonzalez, chairman and chief executive officer, AbbVie.  "Our mid- to late-stage pipeline contains a number of potentially significant opportunities, and we look forward to a series of milestones across our pipeline in the coming months."
>
> * * *
>
> • Worldwide sales were $4.658 billion in the third quarter, up 3.3 percent.  On an operational basis, sales increased 3.6 percent, excluding a 0.3 percent unfavorable impact from foreign exchange rate fluctuations.  Sales increased in the quarter despite the decline in TriCor/Trilipix sales due to the loss of exclusivity.  Excluding TriCor/Trilipix sales and foreign exchange, sales increased 10.9 percent in the quarter.
> • Sales growth was driven by the continued strength of HUMIRA.  Global HUMIRA sales increased 19.1 percent on both a reported and operational basis.  U.S. HUMIRA sales grew 22.3 percent.  Total company sales growth was also driven by strong growth from other products including Synthroid, Creon, Zemplar and Duodopa.
> • Third-quarter adjusted gross margin ratio was 79.7 percent, excluding intangible asset amortization and other specified items.  Gross margin strength in the quarter was driven by operational efficiencies and product mix, including strong HUMIRA sales and better-than-expected lipid performance despite loss of exclusivity.  The gross margin ratio under U.S. generally accepted accounting principles (GAAP) was 76.6 percent.

*February 21, 2014 Form 10-K*

112.     On February 21, 2014, the Company filed its annual report on Form 10-K with the SEC for its fourth fiscal quarter and year ended December 31, 2013 (the "2013 10-K"), signed by Defendants Gonzalez, Chase, Alpern, Austin, Burnside, Liddy, Rapp, Tilton, and Waddell.

113.     The 2013 10-K provided the Company's financial results for the fourth quarter and year, and provided the Company's "Strategic Objectives," stating, in relevant part:

> AbbVie's long-term strategy is to maximize its existing portfolio of products through new indications, share gains, increased geographic expansion in underserved markets while also advancing its new product pipeline to meet unmet medical needs. To successfully execute its long-term strategy, AbbVie will focus on expanding HUMIRA sales, advancing the pipeline, expanding its presence in emerging markets and managing its product portfolio to maximize value.
>
> AbbVie expects to continue to drive strong HUMIRA sales growth in several ways. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as uveitis, hidradenitis suppurativa and pediatric Crohn's disease. AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets.

114.     The 2013 10-K moreover noted that AbbVie is subject to certain laws and regulations, including those concerning sales and marketing practices and kickbacks, stating, in relevant part:

> The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such

violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

115.    Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gonzalez and Chase attesting to the accuracy of the 2013 10-K.

*March 24, 2014 Proxy Statement*

116.    On March 24, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement").  Defendants Gonzalez, Alpern, Austin, Burnside, Liddy, Rapp, Tilton, and Waddell solicited the 2014 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

117.    The 2014 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  Moreover, the 2014 Proxy Statement references the Governance Guidelines.  The 2014 Proxy Statement was false and misleading because Abbvie's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein, including the Individual Defendants allowing false and misleading statements to be issued to the investing public.

118.    The Individual Defendants also caused the 2014 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ a "pay-for-performance process" while failing to disclose that the Company's financial prospects were

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2014 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

119.    Further, the 2014 Proxy Statement failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.

### *February 20, 2015 Form 10-K*

120.    On February 20, 2015, the Company filed its annual report on Form 10-K with the SEC for its fourth fiscal quarter and year ended December 31, 2014 (the "2014 10-K"), signed by Defendants Gonzalez, Chase, Alpern, Austin, Burnside, Liddy, Rapp, Tilton, and Waddell.

121.    The 2014 10-K provided the Company's financial results for the fourth quarter and year, and provided the Company's "Strategic Objectives" for 2015, stating, in relevant part:

> In 2015, AbbVie expects sales performance to be driven by continued strong growth from HUMIRA, the launch of VIEKIRA PAK, and sales growth in certain key products including Creon and Duodopa, partially offset by a decline in several products due to generic competition, including AndroGel 1% and the remainder of the lipid franchise. In addition, AbbVie expects to achieve operating margin improvements while continuing to invest in its pipeline in support of opportunities in oncology, HCV, and immunology, as well as continued investment in key products. AbbVie expects to grow operating cash flows in 2015, which will enable the company to continue to augment its pipeline through concerted focus on strategic licensing, acquisition and partnering activity and returning cash to shareholders via dividends and share repurchases.
>
> AbbVie expects to continue to drive strong HUMIRA sales growth in several ways. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as uveitis and hidradenitis suppurativa. AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets. AbbVie plans to continue making investments in key emerging markets, including Brazil, China, and Russia.

122.    The 2014 10-K moreover noted that AbbVie is subject to certain laws and regulations, including those concerning sales and marketing practices and kickbacks, stating, in relevant part:

> The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

123.    Attached to the 2014 10-K were SOX certifications signed by Defendants Gonzalez and Chase attesting to the accuracy of the 2014 10-K.

***March 20, 2015 Proxy Statement***

124.    On March 20, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement"). Defendants Gonzalez, Alpern, Austin, Burnside, Liddy, Rapp, Tilton, and Waddell solicited the 2015 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

125.    The 2015 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

requires mandatory training on its code of conduct. Moreover, the 2015 Proxy Statement references the Governance Guidelines. The 2015 Proxy Statement was false and misleading because Abbvie's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein, including the Individual Defendants allowing false and misleading statements to be issued to the investing public.

126. The Individual Defendants also caused the 2015 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ a "pay-for-performance process" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

127. Further, the 2015 Proxy Statement failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.

### February 19, 2016 Form 10-K

128. On February 19, 2016, the Company filed its annual report on Form 10-K with the SEC for its fourth fiscal quarter and year ended December 31, 2015 (the "2015 10-K"), signed by Defendants Gonzalez, Chase, Alpern, Austin, Burnside, Liddy, Rapp, Tilton, and Waddell.

129. The 2015 10-K provided the Company's financial results for the fourth quarter and year, and provided the Company's "Strategic Objectives" for 2016, stating, in relevant part:

> AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. AbbVie intends to continue to advance its mission in a number of ways, including (i) growing revenues through continued strong performance from its existing portfolio of on-market products, including its flagship brands, HUMIRA,

IMBRUVICA and VIEKIRA PAK, as well as growth from pipeline products; (ii) expanding gross and operating margins; (iii) continued investment in its pipeline in support of opportunities in immunology, oncology, and virology, as well as continued investment in key on-market products; (iv) augmentation of its pipeline through concerted focus on strategic licensing, acquisition and partnering activity with a focus on identifying compelling programs that fit AbbVie's strategic criteria; and (v) returning cash to shareholders via dividends and share repurchases. In addition, AbbVie anticipates several regulatory submissions and key data readouts from key clinical trials in 2016.

AbbVie expects to achieve its revenue growth objectives as follows:

- HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution and expansion to new indications for hidradenitis suppurativa (regulatory approval in the United States and EU achieved in 2015) and uveitis (regulatory submissions in the United States and the EU are under review with approval expected in 2016).

130. The 2015 10-K moreover noted that AbbVie is subject to certain laws and regulations, including those concerning sales and marketing practices and kickbacks, stating, in relevant part:

The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

131. Attached to the 2015 10-K were SOX certifications signed by Defendants Gonzalez and Chase attesting to the accuracy of the 2015 10-K.

### March 21, 2016 Proxy Statement

132.    On March 21, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement"). Defendants Gonzalez, Alpern, Austin, Burnside, Liddy, Rapp, Tilton, and Waddell solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

133.    The 2016 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct. Moreover, the 2016 Proxy Statement references the Governance Guidelines. The 2016 Proxy Statement was false and misleading because Abbvie's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein, including the Individual Defendants allowing false and misleading statements to be issued to the investing public.

134.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ a "pay-for-performance process" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

135.    Further, the 2016 Proxy Statement failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.

### February 17, 2017 Form 10-K

136.    On February 17, 2017, the Company filed its annual report on Form 10-K with the SEC for its fourth fiscal quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Gonzalez, Chase, Alpern, Austin, Burnside, Hart, Liddy, Rapp, Tilton, and Waddell.

137.    The 2016 10-K provided the Company's financial results for the fourth quarter and year, and provided the Company's "Strategic Objectives" for 2017, stating, in relevant part:

> AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. AbbVie intends to continue to advance its mission in a number of ways, including: (i) growing revenues through continued strong performance from its existing portfolio of on-market products, including its flagship brands, HUMIRA and IMBRUVICA as well as growth from pipeline products; (ii) expanding operating margins; (iii) continued investment in its pipeline in support of opportunities in immunology, oncology, virology and neurology as well as continued investment in key on-market products; (iv) augmentation of its pipeline through concerted focus on strategic licensing, acquisition and partnering activity with a focus on identifying compelling programs that fit AbbVie's strategic criteria; and (v) returning cash to shareholders via dividends and share repurchases. In addition, AbbVie anticipates several regulatory submissions and key data readouts from key clinical trials in the next twelve months.
>
> AbbVie expects to achieve its strategic objectives as follows:
>
> - HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership and strong commercial execution.

138.    The 2016 10-K moreover noted that AbbVie is subject to certain laws and regulations, including those concerning sales and marketing practices and kickbacks, stating, in relevant part:

The health care industry is subject to various federal, state and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment and exclusion from participation in federal and state health care programs, including Medicare, Medicaid and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

139.    Attached to the 2016 10-K were SOX certifications signed by Defendants Gonzalez and Chase attesting to the accuracy of the 2016 10-K.

*March 20, 2017 Proxy Statement*

140.    On March 20, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Gonzalez, Alpern, Austin, Burnside, Hart, Liddy, Rapp, Tilton, and Waddell solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

141.    The 2017 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct. Moreover, the 2017 Proxy Statement references the Governance Guidelines. The 2017 Proxy Statement was false and misleading because Abbvie's Code of Conduct and Governance Guidelines were not followed as a result of

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

the misconduct detailed herein, including the Individual Defendants allowing false and misleading statements to be issued to the investing public.

142. The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ a "pay-for-performance process" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

143. Further, the 2017 Proxy Statement failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.

### *February 16, 2018 Form 10-K*

144. On February 16, 2018, the Company filed its annual report on Form 10-K with the SEC for its fourth fiscal quarter and year ended December 31, 2017 (the "2017 10-K"), signed by Defendants Gonzalez, Chase, Alpern, Austin, Burnside, Hart, Liddy, Meyer, Rapp, Tilton, and Waddell.

145. The 2017 10-K provided the Company's financial results for the fourth quarter and year, and provided the Company's "Strategic Objectives" for 2018, stating, in relevant part:

> AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. AbbVie intends to continue to advance its mission in a number of ways, including: (i) growing revenues by diversifying revenue streams, driving late-stage pipeline assets to the market and ensuring strong commercial execution of new product launches; (ii) continued investment and expansion in its pipeline in support of opportunities in immunology, oncology and neurology as well as continued investment in key on-market products; (iii) expanding operating margins; and (iv) returning cash to shareholders via dividends and share repurchases. In addition,

AbbVie anticipates several regulatory submissions and key data readouts from key clinical trials in the next twelve months.

AbbVie expects to achieve its strategic objectives through:

- HUMIRA sales growth by driving biologic penetration across disease categories, maintaining market leadership and effectively managing biosimilar erosion.

146. The 2017 10-K moreover noted that AbbVie is subject to certain laws and regulations, including those concerning sales and marketing practices and kickbacks, stating, in relevant part:

> The health care industry is subject to various federal, state and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment and exclusion from participation in federal and state health care programs, including Medicare, Medicaid and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

147. Attached to the 2017 10-K were SOX certifications signed by Defendants Gonzalez and Chase attesting to the accuracy of the 2017 10-K.

***March 19, 2018 Proxy Statement***

148. On March 19, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Gonzalez, Alpern, Austin, Burnside, Hart, Liddy, Meyer, Rapp,

Tilton, and Waddell solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

149.    The 2018 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.   Moreover, the 2018 Proxy Statement references the Governance Guidelines.   The 2018 Proxy Statement was false and misleading because Abbvie's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein, including the Individual Defendants allowing false and misleading statements to be issued to the investing public.

150.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ a "pay-for-performance process" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

151.    Further, the 2018 Proxy Statement failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**The Truth Emerges**

*September 18, 2018 Complaint*

152.    On September 18, 2018, the State of California filed a redacted complaint in the Illegal Kickback Action against AbbVie and culpable parties yet to be identified, alleging systematic and repeated violations of the Insurance Frauds Prevention Act by providing kickbacks to healthcare providers throughout California to get these providers to prescribe HUMIRA in much greater amounts than these healthcare providers would have prescribed it but for the illegal kickbacks.

*September 18, 2018 Bloomberg Article*

153.    On September 18, 2018, *Bloomberg* published an article reporting on the Illegal Kickback Action, stated, "California Sues AbbVie Over Alleged Arthritis Drug Kickbacks."  The article quoted various parts of the complaint filed in the Illegal Kickback Action, and provided a brief summary of the allegations made therein, stating, in relevant part:

> California's insurance regulator is suing AbbVie Inc., alleging that the pharmaceutical giant gave illegal kickbacks to health-care providers in order to keep patients on its blockbuster rheumatoid arthritis drug Humira.
>
> The company "engaged in a far-reaching scheme including both classic kickbacks -- cash, meals, drinks, gifts, trips, and patient referrals -- and more sophisticated ones -- free and valuable professional goods and services to physicians to induce and reward Humira prescriptions," the California Department of Insurance said in a statement.
>
> According to the state, AbbVie paid for registered nurses that it called ambassadors to help doctors with patients who were taking Humira. While the nurses were represented to patients as an extension of the doctor's office, they were trained to tout the drug while downplaying its risks, the state said.
>
> "AbbVie spent millions convincing patients and health care professionals that AbbVie Ambassadors were patient advocates -- in fact, the Ambassadors were Humira advocates hired to do one thing, keep patients on a dangerous drug at any cost," Insurance Commissioner Dave Jones said in the statement.

The alleged misconduct "is particularly egregious because it's well known the drug has very adverse side effects," said Jones in a press conference. Under the ambassador system, complaints or concerns about serious infections, blood problems, or even heart failure -- all known side effects of Humira -- could go unreported to patients' physicians, he said.

* * *

AbbVie's <u>shares</u> dropped after the news of the lawsuit, falling 2.9 percent to close at $92.61 in New York. Jones is intervening in a whistleblower complaint filed in California by a nurse who was employed as an AbbVie ambassador in Florida several years ago. The suit, filed in Alameda County Superior Court, seeks three times the amount of each claim made for Humira as a result of the alleged kickbacks. The lawsuit involves private insurance claims, said Nancy Kincaid, a spokeswoman for the California Department of Insurance.

"We conducted an investigation. We believe there is strong evidence that fraud was committed against private insurance companies," said Kincaid.

154.    On this news, the price per share of AbbVie common stock fell $2.76 per share, or 2.8%, from the previous day's trading price, closing at $92.61 per share on September 18, 2018.

155.    The statements referenced in ¶¶ 111-115, 120-123, 128-131, 136-139, and 144-147 above were materially false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose material adverse facts about AbbVie's business, operations and compliance policies. Specifically, those statements failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls. As a result of the foregoing, AbbVie's public statements were materially false and misleading at all relevant times.

**False and Misleading Statements Related to the Tender Offer**

*May 30, 2018 Press Release*

156.     On May 30, 2018, the Company issued a press release announcing the preliminary results of the Tender Offer.  The press release was also attached to a Form SC TO-I/A accepted by the SEC at 8:01 a.m.  The press release announced, in relevant part:

> Based on the preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 75,743,313 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $105 per share, including 49,129,844 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 94.3 percent.

> In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 71.4 million shares of its common stock at a price of $105 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.5 percent of the shares outstanding. The number of shares to be purchased and the purchase price are preliminary and subject to change. The preliminary information contained in this press release is subject to confirmation by the depositary and is based on the assumption that all shares tendered through notice of guaranteed delivery will be delivered within the two trading day settlement period. The final number of shares to be purchased and the final purchase price will be announced following the expiration of the guaranteed delivery period and completion by the depositary of the confirmation process. Payment for the shares accepted for purchase under the tender offer, and return of all other shares tendered and not purchased, will occur promptly thereafter.

157.     On this news, the price per share of Company stock was trading as high as $103.16 on May 30, 2018, ultimately closing at $103.01 on that date, which was $3.54 higher than its closing price on May 29, 2018.

158.     The Individual Defendants, in breach of their fiduciary duties, failed to disclose and/or cause the Company to disclose that these preliminary results did not contain accurate information, particularly as to the amount of shares to be acquired through the Tender Offer and the price per share of such stock.

**The Truth Emerges**

*May 30, 2018 Press Release*

159.    Later on May 30, 2018, the Company issued a press release announcing updated

preliminary results of the Tender Offer.  The press release was also attached to a Form SC TO-I/A

accepted by the SEC at 5:15 p.m.  The press release stated, in relevant part:

> This update replaces the preliminary results announced at 8:00 am, New York City time, on May 30, 2018.  This update reflects additional shares that were validly tendered by notice of guaranteed delivery, but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare Trust Company, N.A., the depositary for the tender offer. **Final results of the tender offer will be issued no later than June 4, 2018 following the expiration of the notice of guaranteed delivery period.**

> Based on the updated preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 74,033,457 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $103 per share, including 52,915,569 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 98.4 percent.

> In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 72.8 million shares of its common stock at a price of $103 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.6 percent of the shares outstanding. The number of shares to be purchased and the purchase price are preliminary and subject to change. The preliminary information contained in this press release is subject to confirmation by the depositary and is based on the assumption that all shares tendered through notice of guaranteed delivery will be delivered within the two trading day settlement period. The final number of shares to be purchased and the final purchase price will be announced following the expiration of the guaranteed delivery period and completion by the depositary of the confirmation process. Payment for the shares accepted for purchase under the tender offer, and return of all other shares tendered and not purchased, will occur promptly thereafter.

160.    On this news, the price per share of AbbVie stock fell $4.07, or almost 4%, from

the previous day's closing price, closing at $98.94 on May 31, 2018.

161. In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

162. Moreover, the Individual Defendants breached their fiduciary duties by willfully or recklessly failing to correct and causing the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein.

163. In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to engage in the Kickback Misconduct and fail to maintain internal controls.

## DAMAGES TO ABBVIE

164. As a direct and proximate result of the Individual Defendants' conduct, AbbVie has lost and will continue to lose and expend many millions of dollars.

165. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its former CFO, and the Illegal Kickback Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

166. As a direct and proximate result of the Individual Defendants' conduct, AbbVie has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

167.    Plaintiff brings this action derivatively and for the benefit of AbbVie to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AbbVie, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

168.    AbbVie is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

169.    Plaintiff is, and has been at all relevant times, a shareholder of AbbVie. Plaintiff will adequately and fairly represent the interests of AbbVie in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

170.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

171.    A pre-suit demand on the Board of AbbVie is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven individuals: Defendants Gonzalez, Alpern, Austin, Burnside, Hart, Liddy, Meyer, Rapp, Tilton, and Waddell (the "Director-Defendants"), and non-party Rebecca B. Roberts (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors who are on the Board at the time this action is commenced.

172.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their engagement in the Kickback Misconduct and the scheme they engaged in knowingly or recklessly

to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of the Individual Defendants engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

173.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the Kickback Misconduct and/or making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to profit the Company and also make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

174.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made and of the Company's engagement in the Kickback Misconduct as it was occurring. HUMIRA is the Company's largest product, and is responsible for the majority of the Company's revenue.  The prescription of HUMIRA goes to the core operations of AbbVie.

175.    As Board members of AbbVie, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of AbbVie, the Director-Defendants must have been aware of the material facts surrounding the prescription and promotion of the Company's most important product.

176.    Therefore, the Director-Defendants each knew of the Kickback Misconduct at the time it was occurring and the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their

duty of oversight to stop the Kickback Misconduct or to stop or correct such misleading statements and omissions.

177.  Additional reasons that demand on Defendant Gonzalez is futile follow. Defendant Gonzalez has served as the Company's CEO and Chairman of the Board since December 2012. He is thus, as the Company admits, a non-independent director. He receives handsome compensation, including $22,625,243 in the fiscal year ended December 31, 2017.  His insider sales before the fraud was exposed, which yielded over $60.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  As the Company's highest officer he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Gonzalez was responsible for all of the false and misleading statements that were made, including most of which he signed or personally made statements in.  Furthermore, Defendant Gonzalez is a defendant in the Securities Class Action. For these reasons, too, Defendant Gonzalez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.  Additional reasons that demand on Defendant Alpern is futile follow. Defendant Alpern has served as a Company director since 2013, and serves as a member of the Nominations and Governance Committee and the Public Policy Committee. He receives handsome compensation, including $335,929 in the fiscal year ended December 31, 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Alpern signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Alpern breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179. Additional reasons that demand on Defendant Austin is futile follow. Defendant Austin has served as a Company director since 2013, and serves as Chairperson of the Audit Committee and a member of the Compensation Committee. She receives handsome compensation, including $320,300 in the fiscal year ended December 31, 2017. As a trusted Company director and Chairperson of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Austin signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180. Additional reasons that demand on Defendant Burnside is futile follow. Defendant Burnside has served as a Company director since 2013, and serves as a member of the Audit Committee and Nominations and Governance Committee. He receives handsome compensation, including $320,981 in the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's

engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Burnside signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Burnside breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.   Additional reasons that demand on Defendant Liddy is futile follow. Defendant Liddy has served as a Company director since 2013, and serves as Chairperson of the Compensation Committee and as a member of the Public Policy Committee. He receives handsome compensation, including $309,981 in the fiscal year ended December 31, 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Liddy signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Liddy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.   Additional reasons that demand on Defendant Rapp is futile follow. Defendant Rapp has served as a Company director since 2013, and serves as Chairperson of the Public Policy Committee and as a member of the Audit Committee. He receives handsome compensation, including $342,025 in the fiscal year ended December 31, 2017. As a trusted Company director

and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Rapp signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Rapp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183. Additional reasons that demand on Defendant Tilton is futile follow. Defendant Tilton has served as a Company director since 2013, and serves as Lead Director, Chairperson of the Nominations and Governance Committee, and as a member of the Compensation Committee. He receives handsome compensation, including $359,981 in the fiscal year ended December 31, 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Tilton signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Tilton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184. Additional reasons that demand on Defendant Waddell is futile follow. Defendant Waddell has served as a Company director since 2013, and serves as a member of the Audit Committee and the Compensation Committee. He receives handsome compensation, including

$320,981 in the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Waddell signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks that are referenced herein. For these reasons, too, Defendant Waddell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185. Additional reasons that demand on Defendant Hart is futile follow. Defendant Hart has served as a Company director since 2013, and serves as a member of the Nominations and Governance Committee. He receives handsome compensation, including $314,981 in the fiscal year ended December 31, 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Hart signed, and thus personally made the false and misleading statements in, the 2016 and 2017 10-Ks that are referenced herein. For these reasons, too, Defendant Hart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186. Additional reasons that demand on Defendant Meyer is futile follow. Defendant Meyer has served as a Company director since 2013, and serves as a member of the Audit Committee and the Public Policy Committee. She receives handsome compensation, including

$274,731 in the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the Kickback Misconduct and scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Meyer signed, and thus personally made the false and misleading statements in, the 2017 10-K that is referenced herein. For these reasons, too, Defendant Meyer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

187. Additional reasons that demand on the Board is futile follow.

188. All of the Director-Defendants benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of AbbVie stock and stock options held by the Director-Defendants.

189. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

190. All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The

Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

191.     In violation of the Governance Guidelines, the Director-Defendants conducted little, if any, oversight of the Company's issuance of materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

192.     AbbVie has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AbbVie any part of the damages AbbVie suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

193.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

194.    The acts complained of herein constitute violations of fiduciary duties owed by AbbVie's officers and directors, and these acts are incapable of ratification.

195.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AbbVie. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of AbbVie, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

196.    If there is no directors' and officers' liability insurance, then the Directors will not cause AbbVie to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

197.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

200.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

201.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

202.     Under the direction and watch of the Directors, the 2014-2018 Proxy Statements failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.

203.     The 2014-2018 Proxy Statements state that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  Moreover, the 2014-2018 Proxy Statements reference the Governance Guidelines.  The 2014-2018 Proxy Statements were false and misleading because Abbvie's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein, including the Individual Defendants allowing false and misleading statements to be issued to the investing public.

204.     The Individual Defendants also caused the 2014-2018 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ a "pay-for-performance process" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

205.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014-2018 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2014-2018 Proxy Statements, including but not limited to, election of directors, approval of executive compensation, and ratification of an independent auditor.

206.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2014-2018 Proxy Statements.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

207.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AbbVie's business and affairs.

209.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

210.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AbbVie.

211.   In breach of their fiduciary duties owed to AbbVie, the Individual Defendants caused the Company to engage in the Kickback Misconduct and fail to maintain internal controls.

212.   Also in breach of their fiduciary duties owed to AbbVie, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company engaged in the Kickback Misconduct, leading to increased scrutiny from governmental agencies; and (2) the Company failed to maintain internal controls.  As a result of the foregoing, AbbVie's public statements were materially false and misleading at all relevant times.

213.   In further breach of their fiduciary duties owed to AbbVie, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

statements that failed to disclose the true amount of shares and the price for those shares that the Company would purchase through the Tender Offer.

214.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

215.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AbbVie's securities, and disguising insider transactions.

216.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AbbVie's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken

appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

217.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AbbVie has sustained and continues to sustain significant damages.

219.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

220.    Plaintiff on behalf of AbbVie has no adequate remedy at law.

### THIRD CLAIM

#### Against Individual Defendants for Unjust Enrichment

221.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

222.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AbbVie.

223.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from AbbVie that was tied to the performance or artificially inflated valuation of AbbVie, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

224.    Plaintiff, as a shareholder and a representative of AbbVie, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

225.     Plaintiff on behalf of AbbVie has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of AbbVie, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AbbVie;

(c)     Determining and awarding to AbbVie the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing AbbVie and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AbbVie and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of AbbVie to nominate at least six candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)     Awarding AbbVie restitution from the Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: January 30, 2019          Respectfully submitted,

          **HEFFNER HURST**

          */s Matthew T. Hurst*
          Matthew T. Hurst
          30 N. LaSalle Street, Suite 1210
          Chicago, IL 60602
          Telephone: (312) 346-3466
          Facsimile: (312) 346-2829
          Email: mhurst@heffnerhurst.com

          Timothy Brown
          **THE BROWN LAW FIRM, P.C.**
          240 Townsend Square
          Oyster Bay, NY 11771
          Telephone: (516) 922-5427
          Facsimile: (516) 344-6204
          Email: tbrown@thebrownlawfirm.net

          *Counsel for Plaintiff*